Lorna J. WALLACE, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION, a/k/a Raytheon Aircraft Corporation, Defendant.

No. 96–4128–SAC.

United States District Court, D. Kansas.

Jan. 12, 2000.

James E. Benfer, Beth R. Foerster, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for Plaintiff.

Kathryn Gardner, Terry l. Mann, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendant's motion for summary judgment (Dk.101). This is an employment discrimination case in which the plaintiff Lorna J. Wallace ("Wallace") alleges the defendant Beech Aircraft Corporation ("Beech") discriminated against her because of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq., and the Kansas Age Discrimination in Employment Act ("KADEA"), K.S.A. § 44–1111. She also alleges a state law claim for breach of an implied employment contract. Both sides request oral argument on the pending motion. The court does not believe that oral argument would materially assist it in resolving the arguments advanced.

### PRETRIAL ORDER

The parties' memoranda are confusing because they do not lay out the different claims still at issue in this case and do not link their arguments to the particular claims. The pretrial order, which was filed subsequent to the parties' memoranda, sheds some light on what claims are remaining. As far as her age discrimination theories, the plaintiff Wallace asserts the following claims of discrimination in her factual contentions and legal theories: (1) In August of 1992, she was laid off because of her age, but she was told it was due to a reduction in force; (2) After the defendant Beech re-employed her one week later, the plaintiff worked for Department 887 before being transferred to Beech Sales Inc. ("BSI") in June of 1993, in violation of company policies and she was subjected to age discriminatory treatment there, including unfair job evaluations, inadequate secretarial equipment and exclusion from staff meetings; (3) In October of 1993, the plaintiff was transferred to the Flight Delivery Center where because of her age she received low performance evaluations, inadequate job training and no opportunity for improvement and was terminated in July of 1994; and (4) After her termination, the plaintiff has not been hired nor even interviewed for secretarial positions for which she is qualified. The court cannot find any mention of an implied contract claim in the plaintiff's factual contentions and legal theories portion of the pretrial order. Nonetheless, there is an issue of fact that states: "Whether defendant breached an implied contract related to termination of plaintiff's employment and to consider plaintiff for other employment." (Dk.129, p. 18).

### SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." Id. There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the non-moving party. Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." Burnette v. Dow Chemical Co., 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." Thomas v. Wichita Coca–Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir.), cert. denied, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that

there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

Summary judgments " 'should seldom be used in employment discrimination cases.' " *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (quoting *Smith v. St. Louis University*, 109 F.3d 1261, 1264 (8th Cir.1997)). Because discrimination claims often turn on the employer's intent, courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir.1994); *see Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994) ("[T]he summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." (quotation and citation omitted)). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.*, 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds*, *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

## STATEMENT OF UNCONTROVERTED FACTS

For purposes of this motion only, the court considers the following to be the uncontroverted facts relevant to its ruling:

1. At the age of 18, Wallace began working for Beech in 1956. Following reclassifications and transfers, she became a clerical staff member in 1970 and worked in that capacity for various managers.

2. In June of 1984, she and other employees in clerical positions were reclassified from the hourly employee payroll to the salaried nonexempt payroll ("NESP"). Before this reclassification, hourly employees were accorded generally the same treatment that was established by the collective bargaining agreement with the company and the International Association of Machinists and Aerospace Workers ("IAM"). Thus, hourly employees enjoyed certain recall rights after layoff. After reclassification, however, NESP employees no longer had recall rights and were subject to rehire only at the company's option. Wallace understood that she was an NESP employee who was not covered by the union agreement.[1]

1. None of the plaintiff's citations support an inference that following the reclassification she still enjoyed a right to recall upon a layoff.

3. From 1985 to August of 1992, Wallace worked in Department 95 as a staff member and as a translator/interpreter. On August 7, 1992, she was laid off during a reduction in force. Wallace never filed any complaint with the KHRC or the EEOC regarding the August 1992 layoff.

4. On August 14, 1992, Wallace's employment with Beech resumed as she became a secretary in Department 887. Wallace did not have a problem with being recalled to this department and does not believe she suffered any discriminatory treatment because of her age while there. In 1993, Beech had another reduction in force and Wallace was chosen for layoff from Department 887. Just before the layoff, Wallace was loaned to Department 500, effective June 28, 1993, and was officially transferred there a week later. Department 500 was a small subsidiary company known as Beechcraft Sales, Inc. ("BSI").

5. Wallace has a number of complaints regarding her treatment while at BSI. She received several mixed job performance reviews. She spoke with Mike Sloan, manager of the Delivery Center (Department 59), saying she was interested if he ever had an opening. Concerned over her job at BSI, Wallace spoke with Don Cary, Vice President–Marketing, who in turn asked Mike Sloan to consider her for an opening there. Wallace was transferred to the Delivery Center on October 15, 1993. Wallace never filed with the KHRC or the EEOC an administrative charge alleging the events that occurred while employed at BSI.

6. The Delivery Center is where customers pick up their newly-purchased aircraft and where the company aircraft and private aircraft refuel. Wallace's job duties included basic secretary/receptionist work like answering telephones and taking messages, typing memoranda, greeting customers and handling customer inquiries, plus some retail sales work in processing fuel purchase invoices, handling credit card transactions, selling items from the gift shop area, and monitoring gift shop inventory. Her job duties were not described in writing, as the Delivery Center was undergoing changes that were affecting job responsibilities there.

7. Her superiors at the Delivery Center, Mike Sloan and Judy Pendergraft, were confronted with numerous issues about Wallace's job performance. She incorrectly recorded telephone messages and fuel invoices. She had difficulty forwarding calls and messages to Sloan and Pendergraft. She put callers on hold and forgot them. She did not timely complete the required attendance forms. Sloan received complaints about Wallace's performance from a number of people.[2]

8. Wallace was "coached" for accepting credit cards that were not honored by the Delivery Center and for repeatedly reordering unnecessary stationery supplies. Wallace many times forgot to turn on the unicom system as part of her daily job responsibilities.[3] Sloan discussed with Wallace her performance deficiencies.

2. The plaintiff attempts to controvert in several ways these noted deficiencies with her job performance. First, she simply asserts that the defendant overstates the deficiencies. Second, she cites deposition testimony of Sloan and Pendergraft where they opine that her performance in certain areas was good or even exceptional. Third, she cites one example where she found only three errors in a stack of fuel invoices. Fourth, she objects on the basis of hearsay to a business memorandum written by Sloan to Cary documenting their conversations about the plaintiff and stating his plans for dealing with the situation. *See* Fed.R.Evid. 803(6). Fifth, she blames incomplete phone messages on the callers, citing one example. Sixth, she recalls that Sloan and Pendergraft met with Janine Moore in February of 1994, that Wallace received her first negative performance evaluation from Sloan in March of 1994, and that Moore who was 33 years of age replaced Wallace in July of 1994. None of these points controvert the statement that the plaintiff's performance was deficient in the specific ways noted above.

3. Wallace's general averment does not controvert this testimony.

9. Wallace complained that she did not like the newer typewriter in the Delivery Center. Sloan arranged for Wallace to have her old IBM typewriter moved to her work station. When Wallace indicated problems with her hearing, Sloan had a volume control installed on her telephone. Sloan had a heater installed at Wallace's station after she complained about the cold. Sloan arranged for Wallace to attend a word processor training course and had installed on her computer the software she preferred.

10. Wallace has various complaints about Pendergraft's treatment of her. Pendergraft raised her voice towards Wallace in the presence of customers. Her tone of voice and manner was inappropriate and even demeaning or degrading. Wallace testified to one occasion when the telephone on Wallace's desk had rung several times and Pendergraft reached the ringing telephone at the same time as Wallace but grabbed the telephone from Wallace's hand and answered it. Wallace recalled Sloan telling her that he had asked Pendergraft to stop giving Wallace "a hard time." Wallace recalled another time when she had rearranged a display in the gift shop and Pendergraft then directed her to restore the original display. Though admitting that other employees, even some under the age of 40, found it difficult to work with Pendergraft, Wallace believes that Pendergraft treated her more harshly. In 1994, Pendergraft was forty-six years of age and had worked for Beech since 1966. Pendergraft never told Sloan that Wallace's performance warranted termination, and Pendergraft was not asked for her opinion on whether Wallace should be terminated.

11. As reflected in her special evaluations, Wallace's performance did not improve. Her ratings on the evaluations of March 2, 1994, and May 6, 1994, were both "4" with "1" being the best and "5" being the worst.[4]

12. During Wallace's time at the Delivery Center, Sloan met several times with Don Cary to discuss the problems with Wallace's performance. Sloan also spoke with Nita Long, the defendant's Director of Personnel Relations and Employment, regarding his concerns over the plaintiff's performance. Following their advice, he wrote special reviews and shared them with Wallace.

13. According to Wallace, Sloan and Pendergraft met with Janine Moore, a thirty-three year old woman, in late February of 1994. Moore had worked for Beech until 1989 and had worked with Sloan before leaving Beech. In the fall of 1993, she applied for work with Beech and was hired on February 18, 1994, as a department clerk in United Beechcraft, one of Beech's subsidiaries. Although Wallace did not attend the February meeting in Sloan's office and does not know what was said or done during this meeting, she observes that her negative evaluation of March 2, 1994, occurred approximately a week later. Moore does not recall speaking with Sloan about an opening in his department until months after she began working for United Beechcraft. Moore interviewed for the opening resulting from the plaintiff's termination and was hired on August 15, 1994. Moore described this position formerly held by Wallace in these terms:

> Well, it's a very high exposure, very busy atmosphere. There's a lot of people there at different times. You get very, very busy. You have to really be on your toes and be able to handle a lot of stress at times, I mean be capable of dealing with a lot of things at one time.

(Dk.125, Ex. CC, p. 80).

14. On May 18, 1994, Wallace met with Sloan and Cary. They told her that they did not believe she and this job were "suited for one another." They related that her performance had not improved after

---

4. This statement is not controverted by Wallace's conclusory allegation that the evaluation was unfair and not in accord with company policies nor by her opinion of specific examples where she displayed initiative.

the two special reviews. In a memorandum documenting this conversation, Sloan wrote:

> One of Art Wegner's plans for Beech is to "develop customer support that is second to none". This position has a great deal of one on one contact with our customers and therefore it is imperative to have someone in this position that consistently meets and exceeds expectations. Our customers expect and deserve this attention to detail.

(Dk.103, Ex. 34). Cary then told Wallace that he would "be contacting human resources to request her relocation." (Dk.103, Ex. 34). Wallace remembers Cary saying that she would be transferred.

15. On behalf of himself and Cary, Sloan sent a memorandum to Nita Long requesting that the plaintiff be relocated to another position. Long forwarded the request to the Employment Department and was told there was nothing available for Wallace. Sloan also sent to Long a handwritten memorandum, which read:

> I know you indicated that no other positions are available, but I think even if her labor grade was busted back— surely somewhere a clerical position is available that doesn't have the pressure and outside distractions that this position and her last position have had.
>
> The nature of sales and deliveries is constantly changing and I believe Tony needs a job that has a simple lifestyle and a more routine atmosphere.
>
> She truly wants to do well. But I don't think she could ever survive in our environment. We will do what is necessary, but please try to find her something.

(Dk.103, Ex. 35).

16. When asked if she had any reason to believe that Cary had any age bias, Wallace testified, "no." Cary is fifty-six years old and has worked for Beech for thirty-one years. Wallace testified that she has "known Nita Long for a long period of time and" that Long was "always ... very kind to" her. (Dk.102, Ex. 8, p. 68).

17. Sloan sent to Cary the following memorandum about Wallace on July 8, 1994:

> Regarding the employee in question, I do not believe we can continue this person in this position. As we previously discussed, the options are limited:
>
> • Continue "as is".
> —Unacceptable to me, my staff and other Beech personnel.
> • Relocation to another department at Beech.
> —Working with H.R., this has not been successful to date.
> • Layoff
> —If this person is laid off from this department, I will write a job write up to create a position that is above the present requirements. The layoff status would allow recall to this person somewhere at a later date.
> • Termination
> —I'm not totally convinced we can do this. H.R. seems to think we can, but this is subject to my next review. This review is due as soon as we get back from factory vacation.
>
> I would like to schedule a meeting with you, I and Nita Long to decide the plan of action. I would like to resolve this in the near future, but whatever path we take I must have a competent person in this position with expanded responsibilities. I have a person in mind which I introduced you to the other day.
>
> I will schedule this meeting with your concurrence, we need to get this behind us.

(Dk.125, Ex. HH).

18. On July 15, 1994, rather than termination for unsatisfactory performance, Wallace was given the option to choose voluntary resignation with six months of severance pay and an additional lump sum payment of $6,000 to assist in the payment of health insurance premiums. Wallace asked about finding other employment with Beech. Long said she would call employment and she "was hopeful there were some long-term Beechcrafters out

there that would have some concern and offer her [Wallace] an opportunity." (Dk.102, Ex. 7, p. 249). Wallace signed the forms for voluntary resignation. Long explained to Wallace that she would call the employment office, that Wallace also should contact the employment office, and that the office "would work with her to try to find another position." (Dk.102, Ex. 7, p. 251). The employment office did submit Wallace's name and resume for several openings, but other applicants were selected for those positions.[5] Beech also offered to pay for the services of a job placement agency, but Wallace did not take advantage of this offer.

19. On or about January 12, 1995, Wallace filed a complaint with the KHRC alleging she was the victim of age discrimination based on the following:

A. I was hired by the Respondent on or about August 16, 1956, and last worked as a secretary.

B. In about March 1994, I received a negative performance evaluation.

C. In about June 1994, I received another negative performance.

D. On or about July 15, 1994, I was called into the office by upper management, and two sets of documents were presented to me. I was given the option of either resigning or terminating my employment with the Respondent. I chose to resign.

(Dk.103, Ex. 38).

20. The defendant did not learn of the plaintiff's KHRC complaint until July 18, 1996, when the KHRC notified the defendant that the complaint was dismissed because the KHRC had failed to process the complaint timely and serve it on the defendant. (Dk.103, Ex. 39).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

 A plaintiff alleging age discrimination under ADEA, just like a Title VII plaintiff, must file a discrimination charge with either a state or federal administrative agency before filing the suit in federal court. *Philipp v. ANR Freight System, Inc.*, 61 F.3d 669, 676 (8th Cir.1995); *see Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir.1994); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1260 n. 2 (10th Cir.1998). Likewise, a plaintiff alleging discrimination in violation of the KADEA must file a charge with the Kansas Human Rights Commission. K.S.A. 44–1115; *see O'Shea v. Yellow Technology Services, Inc.*, 979 F.Supp. 1390, 1394 (D.Kan.1997), *rev'd on other grounds*, 185 F.3d 1093 (10th Cir.1999). This requirement serves "to give notice of the alleged violation to the charged party; and ... to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance." *Ingels*, 42 F.3d at 625. Thus, " '[a] party may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances.' " *Stephens v. City of Topeka, Kan.*, 33 F.Supp.2d 947, 950 (D.Kan.1999) (quoting *Harrell v. Spangler, Inc.*, 957 F.Supp. 1215, 1219 (D.Kan.1997)), *aff'd*, 189 F.3d 478 (10th Cir.1999) (Table).

For the federal claims to be timely, the plaintiff "must file the charge with the EEOC [Equal Employment Opportunity Commission] within 180 days or with a state agency within 300 days of the complained-of conduct." *Simms*, 165 F.3d at 1326 (citations omitted). Under the KADEA, the administrative charge must be "filed within six months after the alleged act of discrimination." K.S.A. 44–1105(i); *O'Shea*, 979 F.Supp. at 1394.

 A plaintiff generally may not bring such claims unless they were part of

---

**5.** None of the plaintiff's citations controvert this statement. Barbara Mayfield with the Employment Office testified that Long notified her that if positions were available for which Wallace was qualified then they should consider Wallace. While Mayfield could not recall the specific openings for which Wallace was considered, Mayfield did remember submitting Wallace's name for different openings for which she was qualified.

a timely-filed administrative charge for which the plaintiff has received a right-to-sue letter. *Simms v. Oklahoma ex rel. Dept. of Mental Health,* 165 F.3d 1321, 1326 (10th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999). The Tenth Circuit "has adopted a limited exception to the exhaustion rule." *Id.* at 1327. If a plaintiff advances discriminatory acts not alleged in the administrative charge, the rule is that "[t]he suit may include allegations of discrimination reasonably related to the allegations listed in the administrative charge, including new acts occurring during the pendency of the administrative charge." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1409 (10th Cir. 1997) (citation omitted). This exception extends to "most retaliatory acts *subsequent* to an EEOC filing."[6] *Simms,* 165 F.3d at 1327 (citation omitted). " 'However, where a retaliatory act occurs *prior to the filing* of a charge and the employee fails to allege the retaliatory act or a retaliation claim in the subsequent charge, the retaliatory act ordinarily will not reasonably relate to the charge.' " *Simms,* 165 F.3d at 1327 (quoting *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 799 (10th Cir.), *cert. denied,* 522 U.S. 935, 118 S.Ct. 342, 139 L.Ed.2d 266 (1997)).

■ For purposes of this motion, the defendant assumes the plaintiff properly exhausted her administrative remedies on her claims concerning the negative performance evaluations in March and June of 1994 and her termination on July 15, 1994. The defendant's motion concerns all other adverse employment actions preceding March of 1994 and her failure to rehire claim occurring after July 15, 1994.

The plaintiff admits she did not file any administrative charges alleging discriminatory acts prior to March of 1994. The plaintiff makes no attempt to argue that these prior acts of discrimination are reasonably related to her allegations in the administrative charge or are part of a continuing violation. Nor does she make any effort to argue equitable tolling. For these reasons, the defendant is entitled to summary judgment on all ADEA and KADEA claims of discrimination occurring before the negative evaluation of March of 1994.

The plaintiff does contend that her failure to rehire claim arises out of the same allegations concerning her termination. A reasonable reader of the plaintiff's administrative charges would not understand that the reference to termination included the failure to rehire. *See Gunnell,* 152 F.3d at 1260. The charges do not reasonably notify the employer of any alleged violation regarding rehiring. When the plaintiff filed her administrative charge, almost six months had passed without the plaintiff being rehired. This period of time without being rehired should have reasonably alerted a person to assert her rights in the administrative charge. The court sustains the defendant's motion for summary judgment on the plaintiff's ADEA and KADEA discrimination claims for failure to rehire after July of 1994.

## AGE DISCRIMINATION CLAIMS

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.,

6. A related exception to the administrative exhaustion rule is the continuing course of conduct doctrine which recognizes that "a claim of discrimination may include challenges to incidents which occurred outside the statutory time limitations of Title VII if the various acts constitute a continuing pattern of discrimination." *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1415 (10th Cir.1993) (internal quotation omitted). However, "[i]f an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge with the EEOC with respect to that event or series of events." *Id.* at 1415 n. 6. This continuing violation exception works prospectively to include discriminatory acts "committed pursuant to a pattern of discrimination challenged in an [EEOC] complaint, but occurring after its filing, [if] reasonably related to that complaint." *Bolden v. PRC Inc.,* 43 F.3d 545, 553 (10th Cir.1994) (internal quotations omitted), *cert. denied,* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995).

makes it unlawful for an employer, *inter alia*, "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The protected class under the ADEA are individuals "who are at least 40 years of age." 29 U.S.C. § 631(a).

■■ To prevail on her disparate treatment claim, the plaintiff " 'must prove by a preponderance of the evidence that ... [Beech] had a discriminatory motive or intent.' " *Thomas v. International Business Machines*, 48 F.3d at 484 (quoting *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1236 (10th Cir.1991)). Wallace need not show that her age was "the sole motivating factor in the employment decision;" she need show only that her age "was also a reason for the employer's decision and that it was the factor that made a difference." *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir.1995) (quotations omitted). In other words, Wallace must show that Beech would not have given her low performance evaluations, inadequate training and no opportunity for improvement and then terminated her but for the age discrimination. *James v. Sears, Roebuck and Co., Inc.*, 21 F.3d 989, 992 (10th Cir.1994). At the same time, absent evidence of an unlawful discriminatory motive, the ADEA does not become a vehicle for evaluating the propriety or second-guessing the employer's judgment in a business decision. *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1426–27 (10th Cir.1993).

"The framework for assessing the evidence in an age discrimination case paral-

lels that applicable in a Title VII case." *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1153 (10th Cir.1990); *see Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1315 (10th Cir.1999). Although direct or indirect evidence may be used to prove employment discrimination, in practice, plaintiffs typically offer only circumstantial proof because "there is rarely direct evidence of discrimination." *Ingels v. Thiokol Corp.*, 42 F.3d at 621. If circumstantial evidence is used, we rely on the burden shifting procedures set out in the Title VII case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The same procedures are used to analyze ADEA claims, *Bullington*, 186 F.3d at 1315, as well as KADEA claims. *Elza v. Koch Industries, Inc.*, 16 F.Supp.2d 1334, 1340 (D.Kan.1998).

■ Under *McDonnell*, a plaintiff must first establish a prima facie case that the employer engaged in the alleged discriminatory practice. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995). The plaintiff must show that: " '(1) she is a member of the class protected by the statute; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class.' " *Bullington*, 186 F.3d at 1315–16 (quoting *Sanchez v. Denver Public Schools*, 164 F.3d 527, 531 (10th Cir.1998)).[7] Proof of a prima facie case creates " 'a rebuttable presumption of discriminatory intent.' " *Ingels v. Thiokol Corp.*, 42 F.3d at 621 (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir.1988)). Of the four elements for her termination claim, the only one that the defendant contests is whether Wallace was qualified for her position by reason of her unsatisfactory job performance.[8] The

---

**7.** The Tenth Circuit has framed the prima facie case for a wrongful discharge claim in these terms: (1) she was "within the protected age group; (2) doing satisfactory work; (3) discharged despite the adequacy of ... [her] work; and (4) replaced by a younger person." *LeFlore v. Flint Industries, Inc.*, 172 F.3d 62, 1999 WL 89281, at *2 (10th Cir. Feb. 23,

1999) (Table) (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 620–21 (10th Cir.1994)).

**8.** "At the *prima facie* stage, the court need only conclude that the plaintiff has shown through credible evidence, including her own testimony, that she was minimally qualified for the position she sought, *even if the defendant disputes that evidence.*" *Bullington v.*

court presumes Wallace's proof is sufficient for a prima facie case on the termination claim. The court reserves its consideration of the defendant's complaints regarding Wallace's performance for the pretext stage. As for the claims of negative evaluations, inadequate training and insufficient opportunity for improvement, the plaintiff comes forth with no evidence that she was treated less favorably than others not within the protected age group or younger persons. Because these claims, however, are factually interrelated and possibly inseparable from her termination claim, the court will do as the parties have done and address them as if a single discrimination claim.

If the plaintiff succeeds in making a prima facie case, the burden shifts to the defendant who can rebut the presumption created by the prima facie case by asserting a "legitimate, nondiscriminatory reason for the employee's [treatment]." *Ingels*, 42 F.3d at 621. "[T]he defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir.1992) (citations omitted). The defendant's reason for discharge, however, "must be reasonably specific and clear." *Id.*

Beech has come forth with evidence that Wallace's performance in the Delivery Center position was unsatisfactory, that it worked with Wallace to improve her performance, that it tried to find another position for her, and that it terminated her only after her performance failed to improve and its efforts to locate another position were unsuccessful. Beech notes Wallace's repeated errors in taking telephone messages and handling credit card purchases; her repeated failure to keep track of her supervisors, to notify them when customers were arriving for aircraft, and to carry out daily tasks like turning on the unicom system; her repeated ordering of unnecessary stationery; and her job performance repeatedly being the subject of complaints from co-workers and others. These reasons are facially nondiscriminatory and concern the performance of basic and essential responsibilities of that position. Beech's reasons for the negative evaluations and termination are reasonably specific and clear.

Once the employer produces a legitimate nondiscriminatory reason for the adverse employment actions, then the presumption of discrimination created by the prima facie case " 'simply drops out of the picture.' " *Ingels*, 42 F.3d at 621 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)). " 'At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief.' " *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 327 (10th Cir.1996) (quoting *Randle v. City of Aurora*, 69 F.3d at 451), *cert. denied*, 518 U.S. 1019, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996). "While '[t]his burden is not onerous ... it is also not empty or perfunctory.' " *Hardy*

*United Air Lines, Inc.*, 186 F.3d 1301, 1316 n. 11 (10th Cir.1999). The "failure to meet subjective criteria ... should be considered in addressing whether those articulated reasons are legitimate or pretextual and not as a challenge to the sufficiency of plaintiff's *prima facie* case." *Id.* "If an employer is dissatisfied with the performance of an employee, he can properly raise the issue in rebuttal of the plaintiff's showing." *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1421 (10th Cir. 1991) (quotation omitted); *see Mayo v. Dil-*

*lard's Dept. Stores, Inc.*, 884 F.Supp. 417, 423 (D.Kan.1995). A plaintiff makes a prima facie case as to this prong with credible evidence "that she continued to possess the objective qualifications she held when she was hired, ..., or by her own testimony that her work was satisfactory, even when disputed by her employer, ..., or by evidence that she had held her position for a significant period of time, ...." *MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1121 (10th Cir.1991) (citations omitted).

*v. S.F. Phosphates Ltd. Co.,* 185 F.3d 1076, 1080 (10th Cir.1999) (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323–24 (10th Cir.1997) (internal citations omitted)). A plaintiff may demonstrate pretext by proving either " 'that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence.' " *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence...." *Morgan v. Hilti, Inc.,* 108 F.3d at 1323 (internal quotations omitted). Evidence of pretext includes, but is not limited to, the following: "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria." *Simms v. Oklahoma ex rel. Dept. of Mental Health,* 165 F.3d at 1328. Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment. *Morgan,* 108 F.3d at 1323. "If no facts relating to the pretextuality of the defendant's action remain in dispute, summary judgment is appropriate." *Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793, 798 (10th Cir.1993), *overruled in part on other grounds, Buchanan v. Sherrill,* 51 F.3d 227, 229 (10th Cir.1995).

The question now is whether Wallace has come forth with evidence creating a genuine dispute of material fact as to whether Beech's reason for the challenged action is pretextual. Namely, is there evidence from which a jury could reasonably find that Beech was more likely motivated by Wallace's age or that Beech's reason is unworthy of belief. Wallace presents the following arguments and evidence in an effort to show Beech's stated reasons are pretextual: (1) her performance was judged satisfactory in positions held prior to the Delivery Center; (2) her performance at the Delivery Center was evaluated as satisfactory in some areas; (3) she was not given adequate training for or an adequate opportunity to learn the new responsibilities in the Delivery Center; (4) her supervisors judged her performance deficient using such subjective criteria as lack of initiative; (5) she was never admonished that termination was possible if her performance did not improve; (6) she believes her performance was always satisfactory; (7) Sloan did not consider her performance to be so deficient as to warrant termination but only a transfer; and (8) she received her first negative performance evaluation shortly after Sloan met with the younger woman, Janine Moore, who eventually replaced Wallace. The court is persuaded that no rational factfinder could base a finding of pretext on what are unrelated events, inconsequential facts and opinions, or attenuated inferences.

The change in Wallace's performance reviews does not reasonably support an inference of pretext. The record shows that Wallace received mixed job performance reviews while working in BSI for different supervisors before her transfer to the Delivery Center. Her work at the Delivery Center was described as being "very high exposure," having a "very busy atmosphere" and "a lot of stress," and requiring someone to handle much pressure and many distractions. Wallace has not shown that any of her prior positions made similar demands on her and involved as much pressure and distractions. The court simply cannot draw from this record anything suspicious about the plaintiff's poorer performance reviews while at the Delivery Center.

■ When asked by the plaintiff's counsel to identify areas where the plaintiff's work was good, Judy Pendergraft testified that Wallace typed quickly, spoke Spanish, had very good telephone manners, and was very pleasant in greeting customers. The

1150

plaintiff also cites testimony where customers and co-employees had passed on compliments about her courteousness. The plaintiff argues her supervisors discriminated against her by not documenting or giving her due credit for those areas where her performance was satisfactory. The record does not sustain this inference. In both of her Delivery Center performance evaluations, Sloan gave Wallace a high rating in communication and commented about her polite and courteous manner. "Finally, it is of no importance" that the plaintiff's performance was satisfactory in some areas without some showing that similarly situated employees who did not belong to the protected class were treated differently. *Morgan v. Hilti*, 108 F.3d at 1324. Satisfactory performance in some areas "does not tend to show the falsity of the [employer's] proffered reasons" of deficient performance in other areas. *Stephens v. City of Topeka, Kan.*, 33 F.Supp.2d at 963.

■ The plaintiff baldly asserts a discriminatory inference from what she calls inadequate training for her position and inadequate opportunity to learn her responsibilities. The plaintiff insists company policy also was not followed in that she was never admonished about the possibility of termination [9] if her performance did not improve. "[D]isturbing procedural irregularities (*e.g.*, falsifying or manipulating hiring criteria)" may be evidence of pretext. *Simms*, 165 F.3d at 1328. The plaintiff has not produced evidence to support her allegation that her training, evaluations or coaching sessions with Sloan or Pendergraft were contrary to established Beech company policy. Nor has she shown how her training or opportunity for improvement was inadequate.[10] As described in the record, the plaintiff's work responsibilities cannot be characterized as highly or particularly involved, technical,

or difficult, as to warrant special training or a longer period to learn. Any deviation here from some procedural norm is not sufficient to sustain an inference of pretext. *See Rea*, 29 F.3d at 1459. The plaintiff's subjective opinion about the fairness or adequacy of such procedures "is not evidence of pretext." *Bullington v. United Air Lines, Inc.*, 186 F.3d at 1318. "The ADEA is not a vehicle for reviewing the propriety of business decisions." *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d at 1426. Put another way, a court "will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives." *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1404 (10th Cir.1988).

■ The plaintiff next contends that the defendant overstates the deficiencies with her performance and that her performance was always adequate. The plaintiff's opinion about her performance is not relevant. " 'It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [her] own relative performance.' " *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir.1999) (quoting *Furr v. Seagate Technology. Inc.*, 82 F.3d 980, 988 (10th Cir.1996), *cert. denied*, 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997)). Indeed, " 'arguing about the accuracy of employer's assessment [of plaintiff's performance] is a distraction, because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest.' " *Bullington*, 186 F.3d at 1318 (quoting *Kariotis v. Navistar Intern. Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997)); *see Hardy*, 185 F.3d at 1080. The plaintiff personally admits she made mistakes and only disputes whether they were significant enough to warrant termination.

9. As revealed in her testimony about the meeting in May with Carey and Sloan, the plaintiff understood that she would not remain working in the Delivery Center and that her employment with Beech depended on her transfer to another position.

10. The uncontroverted facts appearing in paragraph nine above show that Sloan worked with Wallace to provide the equipment, training and environment that promoted her performance.

The plaintiff's one example where she found only three mistakes in one stack of fuel invoices does not suffice in showing her employer's assessment to be pretextual. *See Stephens*, 33 F.Supp.2d at 960. It is not this court's "province to decide whether [Beech's proffered] reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for plaintiff's termination." *Hardy*, 185 F.3d at 1083.

The plaintiff contends an inference of discrimination is supported by the defendant's use of subjective criteria in the negative performance evaluations. The record does not demonstrate that Wallace's supervisors relied exclusively or even principally on subjective criteria in evaluating her. While her performance evaluations included comments about lack of initiative, there were also comments about needing improvement in her quantity of work, her understanding of job responsibilities, her follow through with tasks, and her knowledge of the Delivery Center and customer service procedures. For that matter, the performance issues raised about her mistakes with telephone messages, credit card transactions and fuel receipts are not subjective criteria. Plainly, the mere mention of subjective criteria does not create an issue of pretext and does not prove intentional discrimination here. *See Doan v. Seagate Technology, Inc.*, 82 F.3d 974, 978 (10th Cir.1996), *cert. denied*, 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997).

In arguing that Sloan did not initially seek her termination but only a transfer, the plaintiff does not help her cause. Sloan consistently took the position with the plaintiff's performance, as evidenced by several memoranda written at the time, that her conduct and personality were good but that her performance in this high profile and high pressure position was unacceptable and, thus, she was not suited for it. Sloan believed Wallace possessed the abilities to handle a simpler and more routine job that did not place as much pressure on her to handle outside distractions and to adapt to a constantly changing environment. Though told in May that she would be transferred, the plaintiff was terminated in July when the Employment Department was unable to locate another position for her. These facts do not sustain any inference of pretext in Sloan's stated reasons for requesting the plaintiff's removal from the Delivery Center position.

Don Cary arranged for the plaintiff's transfer to the Delivery Center in October of 1993. Seven months later, Cary concurred with Sloan that the plaintiff's performance had shown that she was not suited for the position. Cary told Wallace in May that he would be requesting her relocation. When no such transfer occurred, Cary in July approved proceeding with her termination or seeking her voluntary resignation. Cary even participated in the meeting with the plaintiff that resulted in her resignation. That Cary decided to transfer the plaintiff away just seven months after finding her this position in the Delivery Center and then was willing to terminate her just two months later "cuts against any inference" that the plaintiff's age played any role in either of Cary's decisions. *See Stephens v. City of Topeka, Kan.*, 33 F.Supp.2d at 963.

In an effort to show another motive for Sloan's negative evaluations of her performance, the plaintiff points to a February meeting between Sloan and her eventual replacement, Janine Moore, shortly before her first written evaluation in March. The plaintiff is without any personal knowledge about what was said in that meeting. The plaintiff does not point to anything that would sustain an inference of discrimination as opposed to a mere coincidence in timing. In fact, Nita Long testified that Sloan came to her with concerns over Wallace's performance no later than December of 1993. (Dk.102, Ex. 7, p. 208). Conjecture that an employer's reasons are pretextual does not defeat summary judgment.

In a disparate treatment case, pretext may be shown by reference to other similarly situated non-minority employees who receive disparate treatment.

"Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu*, 112 F.3d at 1404 (quotation omitted). The plaintiff offers no evidence that her supervisors tolerated similar or worst performance from younger employees or that transfers were found for younger employees who were similarly situated. That other secretarial positions at Beech were filled between May and July of 1994 does not establish an inference of discrimination. The plaintiff presents no evidence showing a disparity between her qualifications and those of younger persons hired to the other positions. *Bullington*, 186 F.3d at 1319. Thus, the court can infer no pretext. The ADEA does not require an employer to give special treatment to older workers to the disadvantage of junior employees; it requires only that older workers be treated fairly. *See Jones v. Unisys Corp.*, 54 F.3d 624, 630 n. 6 (10th Cir.1995). Finally, the plaintiff offers no admissible evidence that Sloan made any comments directed to her age or to any other employee's age.

The evidence overwhelmingly supports the defendant's proffered reasons for the plaintiff's termination, and the plaintiff's meager evidence is insufficient to create a genuine issue of material fact as to pretext. *Shorter*, 188 F.3d at 1209 (" 'The mere existence of a scintilla of evidence ... is insufficient to create a dispute of fact that is genuine....' " (quoting *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir.1997))). The plaintiff's subjective self-appraisals and her own speculation presents nothing which would cause a reasonable finder of fact to determine that the defendant's reasons are unworthy of belief. Summary judgment is proper on the plaintiff's ADEA and KADEA claims.

**IMPLIED CONTRACT CLAIM**

In its reply brief, the defendant raises again the argument that it did not breach any alleged implied contract with the plaintiff. "As alleged in the complaint, the implied contract was the defendant's promise to consider the plaintiff for other available positions at the time of her constructive discharge." (Dk. 119, Court's Memorandum and Order p. 6). The defendant points to the testimony of Barbara Mayfield that the plaintiff's name and file was submitted for several job openings following her termination. Mayfield further testified that Wallace contacted the employment office about certain openings and that Mayfield had submitted Wallace for those openings also. (Dk.103, Ex. 37, ¶.140–44). Thus, if there was any implied unilateral obligation to consider Wallace for other positions, the defendant says it did not breach that obligation.

The plaintiff has not effectively controverted Mayfield's testimony on this point. That Mayfield could recall having submitted the plaintiff's name but not the particular openings does not create a genuine issue of material fact. The plaintiff points to no circumstance that makes Mayfield's incomplete recall of the details so suspicious as to create a genuine issue about her credibility on this point. Considering both Mayfield's responsibilities with Beech and the apparent number of Beech employees, (Dk.103, Ex. 37, ¶.110–13, 140–44, 217–20), the court finds nothing particularly significant about Mayfield's inability to recall the particular openings for which the plaintiff's name was submitted and considered. Because of the plaintiff's poor performance reviews, one would not reasonably infer a breach simply from the fact the plaintiff was not rehired. Unable to controvert or overcome Mayfield's testimony, the plaintiff cannot prove the defendant breached any implied obligation to consider her for other openings. The defendant is entitled to summary judgment on the plaintiff's implied contract claim.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk.101) is granted.