**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 18 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

RAY HARDY,

      Plaintiff-Appellant,

v.

S.F. PHOSPHATES LIMITED
COMPANY, a Utah limited liability
company,

      Defendant-Appellee,

No. 98-8039

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 97-CV-200-B)**

Gary R. Scott of Hirst & Applegate, P.C., Cheyenne, Wyoming, for Plaintiff-Appellant.

Bruce S. Asay of Associated Legal Group, LLC, Cheyenne, Wyoming, for Defendant-Appellee.

Before **SEYMOUR**, Chief Judge, **PORFILIO** and **KELLY**, Circuit Judges.

**SEYMOUR**, Chief Judge.

Ray Hardy sued his former employer, S.F. Phosphates, under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.*, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, alleging the company illegally terminated his employment due to his age and his heart condition, rather than on the basis of his sexually harassing conduct as S.F. Phosphates asserted. In addition, he claimed that S.F. Phosphates breached an implied contract based on the personnel manual which required progressive discipline and good cause for termination. The district court granted summary judgment for S.F. Phosphates on all counts. We affirm.

I.

Mr. Hardy began working for Chevron Chemical Company in Rock Springs, Wyoming in January 1986 .[1] About five years later, S.F. Phosphates acquired that facility and retained most of the original workforce, including Mr. Hardy. Mr. Hardy was a good employee who consistently performed his assigned duties at the full performance level or higher. He was also a friendly, "touchy" man, who often made physical contact with those with whom he interacted.

---

[1] In reciting the facts, we review the record and the inferences therefrom in the light most favorable to the non-movant, Mr. Hardy. *See Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998).

Over the years, incidents of sexual and other harassment occurred at S.F. Phosphates, and two women brought sexual harassment suits against the company during the spring and summer of 1996. The company hired the human resources company, J.R. Simplot, to help "get these sexual harassment problems that [S.F. Phosphates was] having under control and intensify the training . . . and make sure that [S.F. Phosphates] did not have reoccurrences of these kinds of thing [sic] in the future." Aplt. App. at 431. The company instituted respectful workplace and diversity training sessions to address issues of women and minorities in the workforce, which Mr. Hardy and others attended. Mr. Hardy and other male employees were not always in philosophical agreement with the training sessions, and openly voiced their dissent, occasionally visibly upsetting Cindy Nelson, the presenter.

On October 29, 1996, Ms. Nelson attended a committee meeting in which employees, including Mr. Hardy, discussed issues raised by women in the workplace. Mr. Hardy began to give his opinion on women in the workplace, to which Ms. Nelson responded in effect, "let's not hear this again." Aplt. App. at 57. Mr. Hardy continued, stating that in his view women should be put on a pedestal until they do something to fall off. Soon thereafter the group took its lunch break.

As Ms. Nelson went to get her lunch, Mr. Hardy, who is significantly larger

than she is, approached her from behind and slightly to her left. He then stepped beside her on her left, put his right arm on her right shoulder, and leaned down so that his face was approximately a foot from hers. He said that "this is not worth fighting about" and that everything was all right, to which she responded that the situation was not all right and that "this has got to stop." *Id.* at 58-59. He noticed that she looked a "little T'ed off." *Id.* at 59. He did not perceive that she tried to get away, although according to Ms. Nelson she struggled but could not free herself. Mr. Hardy held Ms. Nelson for five to ten seconds. Afterward, Ms. Nelson was quite upset and retreated to her office for lunch. She continued with the training in the afternoon, but wrote a memo later that day to Darlene Perez, the Human Resources Manager, relating the incident and her discomfort with it. She later conveyed to her employers that she was very upset, afraid, and "felt like that she had been grabbed and aggressively manhandled." *Id.* at 430.

The incident was primarily investigated by three individuals: Jim Williams, a vice-president at S.F. Phosphates and head of the Rock Springs plant, Ms. Perez, and Keith Harkless of J.R. Simplot, the organization providing outside consultation for S.F. Phosphates' problems with harassment and treatment of people in the workplace. They questioned Ed Eyring and Brian Lake, two upper-level managers who had witnessed the lunchroom incident and who generally confirmed Ms. Nelson's version of events, although they did not notice her

-4-

struggle to get away.  They did not interview Bud Nations, the only other person who actually observed the incident, nor did they discuss the incident with Mr. Hardy until November 19, the day he was fired.

On that day Mr. Williams, Ms. Perez, Mr. Harkless, and possibly several others, met with Mr. Hardy.  Mr. Williams informed Mr. Hardy that he was to be terminated and asked if there was anything that would give the company cause to reconsider.  Apparently there was not and at the end of the meeting Mr. Hardy received his termination letter which stated in part:

> After a thorough investigation, the Company has concluded that you have made inappropriate comments of a sexual or gender demeaning nature to three female employees.  You made these comments after receiving training and individual counseling regarding the inappropriateness of such remarks.  In addition, it was concluded that in two separate instances, you embraced female employees against their wishes and in one incident, refused to release her when she tried to get free, hurting her arm.
> Because of the above violations of Company policy, and because your actions and comments demonstrate an unwillingness to adhere to company policy and end the inappropriate behaviors, you are being separated from employment.

Aplt. App. at 15.  At the time, as S.F. Phosphates was aware, Mr. Hardy was sixty years old and previously had had bypass surgery and a heart attack.

## II.

A grant of summary judgment is appropriate only if no genuine issue of

material fact exists and the moving party is entitled to judgment as a matter of law. *Templeton v. Neodata Servs. Inc.*, 162 F.3d 617, 618 (10th Cir. 1998). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

We review Mr. Hardy's ADA and ADEA claims under the analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (disability); *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 558-59 (10th Cir. 1996) (age). Under this framework, the plaintiff has the burden of articulating a prima facie case of discrimination.[2] The burden of production then shifts to the employer to articulate a legitimate nondiscriminatory reason for taking the

---

[2] On summary judgment, a plaintiff must simply raise a genuine issue of material fact on each element of the prima facie case. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). To establish a prima facie case under the ADEA, the plaintiff must show 1) he is a member of the class protected by the statute; 2) he suffered an adverse employment action; 3) he was qualified for the position at issue; and 4) he was treated less favorably than others not in the protected class. *Sanchez*, 164 F.3d at 531. To establish a prima facie case under the ADA, the plaintiff must show 1) he is a disabled person under the meaning of the ADA; 2) he is qualified, that is, he is able to perform the essential functions of the job, with or without reasonable accommodation; 3) the employer terminated him under circumstances which give rise to an inference that the termination was based on his disability. *Morgan*, 108 F.3d at 1323; *White v. York Int'l Corp.*, 45 F.3d 357, 360-61 (10th Cir. 1995).

-6-

adverse action against the plaintiff.  *See Sanchez*, 164 F.3d at 531; *Morgan*, 108 F.3d at 1323.  The burden then shifts back to the plaintiff to present evidence "such that a reasonable jury could conclude that the proffered nondiscriminatory reason for the employment action is pretextual, that is, 'unworthy of belief.'" *Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999); *see also Sanchez*, 164 F.3d at 531; *Morgan*, 108 F.3d at 1323.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan*, 108 F.3d at 1323 (internal quotation marks and citation omitted).  While "[t]his burden is not onerous . . . it is also not empty or perfunctory." *Id.* at 1323-24 (internal citations omitted).  The plaintiff need not present direct evidence of illegal discriminatory animus to survive summary judgment.  *See Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).

The district court assumed without deciding that Mr. Hardy had made a prima facie showing of age and disability discrimination.  We do so as well.  The company shouldered its burden of articulating a legitimate reason for the

termination. Mr. Hardy presented no direct evidence that the company discriminated against him on the basis of his age or because of a disability.[3] We therefore must decide whether Mr. Hardy has presented sufficient evidence such that a reasonable jury could find pretext. We emphasize the relevant inquiry is not whether Mr. Hardy intended to engage in sexual harassment, nor is it whether Ms. Nelson could have sued S.F. Phosphates based on Mr. Hardy's conduct. Rather, it is whether S.F. Phosphates perceived Mr. Hardy's behavior as gender-based harassment, or simply used that rationale as a pretext for illegal discrimination because of Mr. Hardy's age or his heart condition. *See Giannopoulos v. Brach & Brock Confections, Inc.* 109 F.3d 406, 411 (7th Cir. 1997) (noting that the "pertinent question" in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual); *cf. DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998); *Furr v. Seagate Tech. Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) (noting that in a pretext case "[it is] the perception of the employee's

---

[3] Mr. Hardy admitted in a deposition that he could produce no such evidence. Aplee. Supp. App. at 25. Mr. Hardy claims that S.F. Phosphates terminated him to avoid insurance costs related to his heart condition. However, the record establishes that S.F. Phosphates paid Mr. Hardy's medical bills without complaint, and that Mr. Williams joked with him about his heart condition because they both had bypass surgery. Mr. Hardy acknowledged that nothing said in these joking conversations supported his claim of disability discrimination, and that no direct evidence supported his age discrimination. *Id.*

performance that is relevant, not plaintiff's subjective evaluation of his own relative performance").

Mr. Hardy points to three weaknesses in S.F. Phosphates' case to establish pretext: 1) S.F. Phosphates gave contradictory explanations as to why it terminated his employment; 2) it conducted a slipshod investigation of the incident with Ms. Nelson; and 3) it did not discipline other younger employees accused of sexual harassment. We consider each contention in turn.

Mr. Hardy first claims that S.F. Phosphates provided contradictory reasons for firing him, pointing to his termination letter, S.F. Phosphates' interrogatory answers, two depositions of Mr. Williams, and S.F. Phosphates' brief on appeal. In Mr. Hardy's termination letter, S.F. Phosphates stated it was terminating him for embracing two female employees against their will, and making "inappropriate comments of a sexual or gender demeaning nature to three female employees." Aplt. App. at 15. In a March 1997 deposition in a sexual harassment case against S.F. Phosphates, Mr. Williams said "Ray Hardy was discharged because he improperly embraced one of our female employees in a very hostile way," *id.* at 17, and then refused to admit he had done anything wrong, *id.* at 18. At that deposition, Mr. Williams testified that Mr. Hardy "said, 'Are we having a good time yet?'" *Id.* In its interrogatory answers in this case, S.F. Phosphates explained it fired Mr. Hardy due to his disruptive behavior during the October

28th meeting and his subsequent touching of Ms. Nelson at the lunch break which it described as "unwarranted, not welcome, and in violation of the Defendant's policy against sexual harassment." *Id.* at 143. When being deposed in this case in February 1998, Mr. Williams described Mr. Hardy as "very, very slow in learning . . . the proper way to approach women in the workplace." *Id.* at 425. Mr. Williams recounted Mr. Hardy's "inappropriate hugging of Ms. Nelson," his unwelcome embrace of Tracy Jackson, another female employee, and his use of an ethnic slur. *Id.* at 424. Mr. Williams explained that because of these actions and because Mr. Hardy did not acknowledge the seriousness of his behavior, the company chose to terminate him. In its brief on appeal, S.F. Phosphates stated it terminated Mr. Hardy because he embraced Ms. Nelson and another female employee against their will, made a gender-demeaning remark to a female employee, and was disruptive during diversity training meetings.

All of S.F. Phosphates proffered reasons for firing center upon Mr. Hardy's inappropriate treatment of female co-employees, and specifically the incident involving Ms. Nelson. The alleged inconsistencies in S.F. Phosphates assertions are insignificant, at best. Mr. Hardy makes much of Mr. Williams' testimony that Mr. Hardy said, "Are we having a good time yet?" because no eyewitness so testified. However, Ms. Nelson stated in the memo she wrote the day of the incident that Mr. Hardy "leaned down directly in my face and said, 'we're just

having a little fun here . . . .'" Aplt. App. at 94.  Any discrepancy is simply too minor to give rise to an inference of pretext.  In addition, Mr. Williams' later recounting of Mr. Hardy's use of an ethnic slur does not undercut his testimony that the company primarily based the decision to fire Mr. Hardy due to his inappropriate treatment of women, particularly Ms. Nelson.  Mr. Williams did not testify that the slur was the sole or primary reason for firing Mr. Hardy.  Rather, he emphasized (as S.F. Phosphates consistently did) that Mr. Hardy's inappropriate behavior towards Ms. Nelson prompted the termination.   Similarly, S.F. Phosphates' references to Mr. Hardy's disruptiveness during diversity training sessions are not inconsistent with its position that the incident with Ms. Nelson primarily prompted his firing.  Mr. Hardy admitted that he had concerns with the content and instruction on diversity training and that he vocalized those concerns even when he realized he was upsetting the presenter, Ms. Nelson.  That conduct is closely linked with the original reasons given by S.F. Phosphates and further explains Ms. Nelson's reaction to Mr. Hardy's embrace.  The "contradictions" on which Mr. Hardy relies are at most minor variations on a central theme.  We agree with the district court that "no rational factfinder could base a finding of pretext on the bare evidence offered by Plaintiff in this regard." Aplt. App. at 438.

Mr. Hardy next claims that the superficiality of S.F. Phosphates'

-11-

investigation of the incident evinces pretext. He argues that the investigative team did not interview most of the people at the meeting, and if it had it would have realized that the incident between Ms. Nelson and Mr. Hardy was not sexual harassment. The investigative team did, however, interview all but one person who was an eyewitness to the event, and the interviewees confirmed that the incident occurred and that they considered it an incident of gender harassment. Aplt. App. at 77, 106; Aplee. Supp. App. at 31-32. The investigative team's decision to believe Ms. Nelson's account after two upper-level managers substantiated it, and not to interview those who merely knew about the event through hearsay, *see* Aplt. App. at 70, does not give rise to an inference of pretext.

Mr. Hardy next asserts S.F. Phosphates disciplined him much more harshly than other younger employees who engaged in egregious sexual harassment, and contends the disparate treatment establishes pretext. "An inference of discrimination may be raised by evidence that a plaintiff was . . . treated less favorably than similarly situated employees who are not in the plaintiff's protected class." *Price v. S-B Power Tool*, 75 F.3d 362, 365 (8th Cir. 1996); *see also Morgan*, 108 F.3d at 1324 ("A satisfactory showing that similarly situated employees, who do not belong to the protected class, were treated differently with regard to violation of a work rule could have lent support to the pretext

argument.").[4]

Mr. Hardy offered evidence that two former employees, Cecilia Haidsiak and Janet Pickinpaugh, were suing S.F. Phosphates for sexual harassment allegedly tolerated in the workplace.[5] The record, viewed in the light most favorable to Mr. Hardy, shows that numerous men used vulgar and sexist language in front of, and in reference to, Ms. Haidsiak and other employees. Employees made obscene gestures and racist remarks to Ms. Haidsiak and on one occasion a male employee exposed his buttocks to her. Male employees also shared pornographic magazines at work. Ms. Haidsiak complained about her co-employees behavior to various managers but they "[p]erformed little or no investigation and took no apparent remedial action." Aplt. App. at 188. All of these incidents occurred during the tenure of Ms. Haidsiak's employment, which

---

[4] Mr. Hardy has presented no evidence that the other employees who engaged in sexual harassment were not disabled, and so his disability claims fail for this reason, as well as the reason stated *infra*. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1405-06 (10th Cir. 1997).

[5] Mr. Hardy has included in the record a fair amount of inadmissible hearsay evidence to support this claim. At the summary judgment stage "the nonmoving party need not produce evidence 'in a form that would be admissible at trial,' *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), but the content or substance of the evidence must be admissible." *See Thomas v. International Bus. Mach.*, 48 F.3d 478, 485 (10th Cir. 1995). We therefore do not consider the sexual harassment complaints of Cecilia Haidsiak and Janet Pickinpaugh, or any other inadmissible hearsay statements contained in the record. We do consider the non-hearsay statements contained in the submitted affidavits, Ms. Haidsiak's sworn interrogatory answers, and deposition testimony.

ended in August 1995. Around this time, male employees played pranks on other female employees but were not disciplined.

After Ms. Haidsiak left S.F. Phosphates, she and another female employee, Janet Pickinpaugh, filed sexual harassment suits against the company. Sometime thereafter, but before the incident between Ms. Nelson and Mr. Hardy, the company intensified diversity and gender issues training sessions. On October 29, 1996, the day of the incident between Mr. Hardy and Ms. Nelson, Mr. Williams was attending a settlement conference in one of the sexual harassment suits. Aplt. App. at 429; Aplt. Reply Br. at 8. The uncontroverted evidence shows that S.F. Phosphates took a more serious stance against gender harassment after the incidents involving Ms. Haidsiak and others, yet well before Mr. Hardy touched Ms. Nelson. Mr. Hardy has not presented evidence of other instances of sexual harassment which occurred after the two lawsuits were filed, or after S.F. Phosphates hired J.R. Simplot, and accordingly has not pointed to similarly situated employees.

Because Mr. Hardy has not alleged that S.F. Phosphates was more lenient with younger employees who engaged in sexual harassment after S.F. Phosphates sensibly toughened its stance, he has not established "inconsistencies" or "implausibilities," *Morgan*, 108 F.3d at 1323, which give rise to an inference of pretext. *See id.* at 1324. S.F. Phosphates may have selected Mr. Hardy as "a

sacrificial lamb," Aplt. Reply Br. at 9, in order to prove it would not tolerate sexual harassment. However, that action is legal if it was not based on Mr. Hardy's age or disability. "Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." *Simms*, 165 F.3d at 1330 (quoting *Verniero v Air Force Academy Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983)). "[I]t is not our province to decide whether [S.F. Phosphates' proffered] reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for plaintiff's termination." *Giannopoulos*, 109 F.3d at 411. Because Mr. Hardy has not presented evidence such that a reasonable jury could find pretext, we affirm the dismissal of Mr. Hardy's age and disability discrimination claims.

III.

Mr. Hardy asserts that S.F. Phosphates breached an implied contract contained in its personnel manual not to terminate him except for cause. Under Wyoming law, "employment is presumed to be at-will; however, '[a] handbook may change the employer's unfettered right to discharge an employee.'" *Sanchez v. Life Care Ctrs. of America*, 855 P.2d 1256, 1257 (Wyo. 1993) (quoting *Leithead v. American Colloid Co.*, 721 P.2d 1059, 1062 (Wyo. 1986)). "In

particular, a systematic discipline procedure or other language in an employee handbook implying termination may be for cause only may defeat the rebuttable presumption that employment is at will." *Lincoln v. Wackenhut Corp.* 867 P.2d 701, 703 (Wyo. 1994). Employers may avoid unintentionally altering their employees' at-will status by including conspicuous, unambiguous language disclaiming the formation of a contract in documents that might otherwise create such an agreement. *See id.* In evaluating whether a disclaimer is sufficiently conspicuous and unambiguous, Wyoming courts consider the prominence of the text of the disclaimer, its placement relative to other text, and the language used. *Id.* at 703-04.

Specifically, Mr. Hardy contends the progressive discipline provisions of S.F. Phosphates' personnel manual created an implied contract which promised workers would only be terminated for cause. He argues that the disclaimers in his employment contract and personnel manuals prior to January 1995 were not conspicuous enough to overcome the presumption raised by the manual, and that the disclaimers from January 1995, albeit conspicuous, fail to modify the terms of his employment because they were not supported by consideration. We disagree.

When S.F. Phosphates was in the process of acquiring Chevron, plant employees including Mr. Hardy filled out employment applications. Above the employee's signature line were six provisions that were indented and in bold type.

The employee was required to check off each provision to verify that he had read and understood each one. Aplt. App. at 449. The third provision stated:

> If employed, I understand that employment and compensation can be terminated at will, with or without cause, and with or without notice, at any time, either at the option of the employee or the company. I understand that no employee or representative of the company, other than the general manger of the company, has the authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing.

*Id.* Mr. Hardy checked off this provision and signed his name below it.

We hold as a matter of law that this disclaimer was sufficiently conspicuous and unambiguous to render Mr. Hardy an at-will employee. The form required the applicant to affirmatively check the at-will provision and several others, and then to sign his name directly below them. The language of the disclaimer leads to but one conclusion: that employment is at-will unless modified by the general manager of the company. Given the prominence, placement, and language of the disclaimer, S.F. Phosphates maintained an at-will relationship with Mr. Hardy.

IV.

We **AFFIRM** the district court's grant of summary judgment in favor of S.F. Phosphates.

-17-