Kathleen R. BRADEN, Plaintiff,

v.

CARGILL, INCORPORATED,
Defendant.

No. 99–4161–SAC.

United States District Court,
D. Kansas.

Oct. 19, 2001.

Terry E. Beck, Topeka, KS, for Plaintiff.

Mary K. Babcock, Brenda S. Clausen, Foulston & Siefkin L.L.P., Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This employment discrimination and retaliation case comes before the court on the motion of defendant Cargill, Inc. for summary judgment.

## I. SUMMARY JUDGMENT STANDARD

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola*

*Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The non-movant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)).

The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas Drilling Partnership v. Federal Deposit Ins. Corp.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

■ Summary judgments " 'should seldom be used in employment discrimination cases.' " *O'Shea v. Yellow Technology Services, Inc.,* 185 F.3d 1093, 1098 (10th Cir. 1999) (quoting *Smith v. St. Louis University,* 109 F.3d 1261, 1264 (8th Cir.1997)). Because discrimination claims often turn on the employer's intent, courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 530 (10th Cir.1994); *see Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994) ("[T]he summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." (quotation and citation omitted)). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.,* 969 F.2d 250, 253 (7th Cir.1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700, 709 (10th Cir.1988), overruled on other grounds, *McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

## STATEMENT OF UNCONTROVERTED FACTS

The court finds the following facts to be undisputed. Some facts alleged by the plaintiff in her brief have been excluded because they are not supported by the record provided to the court.

1. Plaintiff Kathy Braden was employed by Cargill, Incorporated, in its Topeka, Kansas, flour mill on or about September 27, 1995, and worked variously as a baler, a packer, and a sweeper until her discharge on August 24, 1998.

2. Plaintiff and her boyfriend socialized with her supervisor Rick Oiler and his wife outside work. They attended concerts, dinners, and clubs. Mr. Oiler even attend-

ed plaintiffs daughters graduation. Oiler joked with and teased plaintiff occasionally both at work and outside work. Plaintiff claims he made comments about her tan and muscular legs and tight shorts at softball games in 1997, told her that she had "no butt" when she ordered new uniform pants in 1997, and said she looked as though she had a bustier on when plaintiff wore a back brace to work. Plaintiff understood these comments to be jokes, but also claims they were offensive and inappropriate.

3. Sometime in 1997, Oiler kicked plaintiff on the rear end in the break room at work hard enough to make her lose her balance, then told plaintiff "you deserved that." Plaintiff said nothing at the time, but gave Oiler what she believed to be a "dirty look," and understood Oilers actions to be horseplay.

4. A grievance alleging that plaintiff received preferential treatment was filed by Wayne Bagby, another Cargill employee, on March 5, 1997. In response to this grievance, Oiler scrupulously treated all Cargill employees equally.

5. Plaintiff injured her knee at work in late July 1998. Soon after her injury, on August 3rd, plaintiff was transferred by her own request to a sweeper position in the mill, another division of Cargill's Topeka plant.

6. Plaintiffs supervisor scheduled a doctors appointment for her for August 10, 1998, but plaintiff missed that appointment because she was out of town visiting her boyfriends family.

7. Plaintiff was transferred back to the packing department on August 20, 1998, at which time she requested another doctors appointment. Oiler made an appointment for her for August 21, 1998 with Dr. Doug Frye, the company doctor.

8. It was Cargill's regular practice, although not embodied in any written policy, for supervisors to accompany injured employees to the doctor and to be present during the examination. Cargill believes that the supervisors presence provides support for the injured employee and aids the supervisor in understanding work restrictions created by the injury. Dr. Frye agrees that the supervisors presence during the examination creates a better understanding of the injury and helps the supervisors accommodate the needs of the employee.

9. Rick Oiler drove plaintiff to Dr. Frye's office on August 21, 1998. Oiler accompanied plaintiff to the examination room, where plaintiff asked him to leave and not return. Oiler left while plaintiff changed into a gown, returned with Dr. Frye, and observed the doctors examination of plaintiffs right knee.

10. Oiler believed he was required to stay in the room according to company policy. Neither the doctor, the nurse, nor the plaintiff asked Oiler to leave the exam room at any time during the examination, although Dr. Frye routinely asks supervisors to leave the room if an examination would require immodest display.

11. Plaintiff claims that during the examination Oiler teased plaintiff, saying that she had "fat legs" and her injury was due to the fact that she was getting old. Oiler and plaintiff were the same age, and plaintiff understood Oiler to be teasing.

12. Dr. Frye released plaintiff to return to work that day (August 21, 1998) with medical restrictions including a lifting limitation of 25 pounds, and limitations on squatting, stooping and bending. Dr. Frye made a follow-up appointment to see plaintiff on August 28, 1998.

13. Rick Oiler accommodated plaintiffs work restrictions on August 21, 1998, when plaintiff returned to work. Other balers were asked to help plaintiff work within

her limitations on Friday, August 21, 1998, and throughout her weekend work.

14. Plaintiff had accumulated 17 attendance points by Friday, August 21, 1998. Cargill's attendance policy mandates discharge once an employee receives 25 attendance points.

15. Cargill's attendance policy states "An absence without two hours notice before the start of scheduled shift" will result in an attendance infraction of 7 points.

16. Plaintiffs boyfriend, Steve Mayberry, called Rick Oiler on August 22, 1998, at approximately 1:30 a.m. and told Oiler that plaintiff was not able to work because she had a migraine headache and her knee was swollen. Plaintiff was scheduled to begin work at 3:00 that morning. Plaintiff received an attendance infraction of 7 points for not giving the required two hours notice before the start of her shift on August 22nd. Plaintiff concedes that this 7 point infraction, which brought her total to 24, was warranted.

17. Cargill's attendance policy states "If you are sick or absence [sic] more than one day, you should keep your supervisor informed daily of your condition (unless other arrangements for reporting have been made) and tell him/her when you can be expected back on the job." (Dk.52, Exh. 7, p. 3). Pursuant to the attendance policy, "an absence without any notification" will result in an attendance infraction of 10 points. That same policy provides that "points will be issued on a per occurrence basis. For example, missing two consecutive days due to a documentable illness would be considered one absence occurrence. If no documentation is presented you will be charged points on the basis of a single day absence." *Id.* Plaintiff was aware of this attendance policy.

18. Neither plaintiff nor her boyfriend called plaintiffs supervisor on Sunday, August 23, 1998. Plaintiff was scheduled to work a full shift that day, beginning at 7:00

a.m. Plaintiff testified that Mayberry advised Oiler in their conversation on the 22nd that plaintiff was going to take the weekend off, *i.e.,* the 22nd and the 23rd, until the swelling went down.

19. Plaintiff did not work on Saturday, August 22, 1998, or Sunday, August 23, 1998.

20. Plaintiff received 7 points for calling in late on Saturday August 22, 1998, and 10 points for failing to call on August 23, 1998, bringing plaintiffs total number of attendance points to 34, well over the mandatory termination point.

21. Plaintiff was terminated Monday, August 24, 1998, for the stated reason that she had exceeded the maximum points permissible under the company's attendance policy.

22. Cargill's sexual harassment policy states "Employees who feel they have been harassed can raise allegations of harassment" by either informing "the alleged harasser that his/her behavior is offensive and unwelcome and to stop such behavior ... inform[ing] the alleged harassers supervisor ... or contact[ing] their] Division Human Resources Manager/EEO Representative or the Employee Relations Department."

23. Plaintiff never filed a sexual harassment complaint through Cargill's internal complaint process, although she was aware of the complaint procedure. Instead, after her Doctor's appointment on the 21st, plaintiff went to Philip Llamas, the union president, to file a grievance against Oiler.

24. Although plaintiff alleges that she threatened to file a grievance against her supervisor for his presence in the examination room, plaintiff never filed a grievance alleging she was subjected to sexual harassment by Oiler. Plaintiff claims that she spoke to Phil Llamas, the union presi-

dent, about this grievance, but Llamas has no recollection of this conversation. Llamas also recalls no conversation with Rick Oiler during which he allegedly told Oiler about Braden's threatened complaint.

25. Plaintiff testified that Jack Davidson and Travis Belisle reached 25 attendance points but were not terminated.

26. Cargill has discovered no employee except Belisle who reached 25 attendance points but was not terminated. Both males and females have been terminated for exceeding the allowable number of attendance points. Male employees mentioned by plaintiff, including Jack Davidson, have not reached the 25 point limit. Travis Belisie reached 25 attendance points, but these points were later removed because Cargill discovered that Belisle's attendance records were in error and Belisle had actually worked his scheduled shifts. Due to his disabling mental condition, he could not bring himself to use the time clock. Belisle was later terminated for other reasons.

27. Plaintiff filed a grievance asking that her termination be reversed on August 24, 1998. This grievance was denied. Plaintiff failed to respond to the unions notice regarding further steps in the grievance process, and the union closed its file.

28. Plaintiff filed an administrative charge with the KHRC on January 29, 1999, alleging that Cargill had discriminated against her on the basis of sex and disability and that Cargill retaliated against her. This charge was dually filed with the EEOC.

29. Plaintiff received a "no probable cause" finding from the KHRC on June 30, 1999. The EEOC affirmed those findings on July 26, 1999, and issued a right-to-sue notice.

30. Plaintiff subsequently filed this complaint against Cargill, Inc., alleging gender discrimination, hostile working environment sexual harassment, and retaliatory discharge under both federal and state law.

## ANALYSIS

### Failure to use employer's internal reporting procedure

■ Asserting the defense articulated by the United States Supreme Court in *Faragher v. City of Boca Raton,* 524 U.S. 775, 806, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), defendant alleges that although plaintiff was aware of defendant's sexual harassment policy, plaintiff unreasonably failed to use it. Under the asserted defense, an employer cannot be held vicariously liable for the harassing acts of its supervisory employee if it shows: " '(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.' " *Harrison v. Eddy Potash, Inc.,* 158 F.3d 1371, 1375 (10th Cir.1998) (quoting *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275, and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

Defendant fails to recognize that the *Faragher/Burlington* affirmative defense can be raised only if "no tangible employment action [w]as taken" by the harassing supervisor against the plaintiff employee. *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Harrison v. Eddy Potash, Inc.,* 248 F.3d 1014, 1024 (10th Cir.2001) (appeal after remand); *Mallinson–Montague v. Pocrnick,* 224 F.3d 1224, 1228 (10th Cir.2000) ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.")

Here, it is undisputed that plaintiff was terminated. Plaintiff alleges that Oiler's misconduct culminated in a tangible employment action. Under these circumstances, the defense invoked by defendant is inapplicable. *See Metzger v. City of Leawood,* 144 F.Supp.2d 1225, 1252 (D.Kan.2001).

**Failure to Exhaust Administrative Remedies**

Defendant contends that many of plaintiff's allegations are time-barred because they occurred more than 300 days before plaintiff filed her EEOC and KHRC charges on January 29, 1999. These incidents consist of Oiler's comments regarding plaintiff's legs, the "no butt" comment, the bustier comment, and his kicking plaintiff and telling her she deserved it.

■ Section 2000e–5(e) of 42 U.S.C. provides that a discrimination charge must be filed within 300 days after the alleged unlawful conduct occurs. This filing is a prerequisite to a civil suit under Title VII. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

Plaintiff appears to concede that the alleged acts occurring prior to April 5, 1998, the cut-off date stated by defendant in its brief to be 300 days prior to plaintiff's filing date, are outside the time limit imposed by Title VII, as her sole response is that defendant engaged in ongoing violations of Title VII, entitling her to toll the 300 day limit.

■ Under the continuing violation doctrine, "a plaintiff may recover for incidents which occurred outside the statutory time limit if at least one instance of the alleged discriminatory practice occurred within the limitations period and the earlier acts are part of a 'continuing pattern of discrimination.'" *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1310 (10th Cir.1999) (quoting *Martin,* 3 F.3d at 1415). Howev-

er, "[i]f an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge with the EEOC with respect to that event or series of events." *Id.* at 1415 n. 6.

■ Here, the sole event which occurred within the limitations period was Oiler's presence during plaintiff's doctor's examination on August 21, 1998. Although plaintiff alleges that the continuing violation doctrine applies, she makes no analysis of that doctrine or any attempt to relate those events which occurred before April 5, 1998 to Oiler's presence during plaintiff's doctor's examination. Plaintiff's wishful thinking cannot sustain a finding that the events in 1997 amount to a series of related acts of purposeful discrimination, as is required to be admissible under the continuing violation doctrine. Accordingly, consideration of incidents occurring beyond the 300 day limitations period is time-barred.

**Sexual Harassment**

■ Defendant seeks summary judgment on plaintiff's claim of a sexually hostile work environment. Section 703(a) of Title VII forbids an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment. *Id.* Although Title VII does not explicitly mention hostile work environment, a victim of a sexually hostile work environment may nevertheless bring a cause of action under Title VII. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To survive an employer's motion for summary judgment under Title VII, the record must support an inference of a sexually hostile work environ-

ment and a basis for employer liability. *Hirschfeld v. New Mexico Corrections Department,* 916 F.2d 572, 576–79 (10th Cir. 1990).

■ Defendant basis its challenges upon the former, asserting that Oiler's acts were insufficiently severe and pervasive to support an inference of a sexually hostile work environment. It is well established that plaintiff has the burden to show that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create a hostile environment. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In *Harris,* the Court established a two-part test which a plaintiff must satisfy to demonstrate that the harassment was sufficiently severe or pervasive: (1) the harassing conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive;" and (2) the plaintiff must "subjectively perceive the environment to be abusive." 510 U.S. at 21, 114 S.Ct. 367. In analyzing such a claim, courts must look at all relevant circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367.

■ Isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct. *See Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir. 1994), *cert. denied,* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995) (finding two overtly racial comments and one arguably racial remark in eight years not pervasive); *Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1175 (10th Cir.1996) (holding one isolated comment and the use of the term "girlie," not pervasive);

*Creamer v. Laidlaw Transit, Inc.,* 86 F.3d 167, 170 (10th Cir.) (holding single incident of sexual harassment neither sufficiently pervasive nor severe), *cert. denied,* 519 U.S. 983, 117 S.Ct. 437, 136 L.Ed.2d 335 (1996); *but see Smith v. Northwest Financial Acceptance Inc.,* 129 F.3d 1408,1414 (10th Cir.1997) (approximately six statements in twenty-three months, coupled with testimony that such sexually disparaging remarks were repeated frequently, sufficient to raise fact question regarding pervasiveness).

■ Numbers alone are not determinative, however. As the Tenth Circuit has cautioned:

> the word "pervasive" is not a counting measure. The trier of fact utilizes a broader contextual analysis. It begins with the number, sequence, and timing of the conduct. The factfinder then looks at the nuances of an environment that is imposed by each instance of discriminatory behavior.

129 F.3d at 1415.

Therefore, to survive a summary judgment motion on this issue, plaintiff is required to submit sufficient admissible evidence upon which a reasonable jury could find that Oiler had created both an objectively and subjectively sexually hostile environment. *See Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998).

Plaintiff's request for Oiler to leave the examination room and not return, coupled with her complaint that same day to the union president about Oiler's presence in the examination room is sufficient to support a finding that plaintiff subjectively perceived Oiler's act of remaining in the room as objectionable at the time.

■ Plaintiff has presented no evidence from which any reasonable jury could find that Oiler created either an

objectively sexually hostile environment, as is required to make a prima facie case. *See Harris,* 510 U.S. at 21, 114 S.Ct. 367. It is uncontested that Oiler was present during plaintiff's doctor's appointment because he believed that company policy required his presence. No evidence has been presented to support plaintiff's allegations that Oiler witnessed any immodest display by plaintiff during that examination, or that plaintiff was partially disrobed at any time when Oiler was present. Had the company doctor believed that any immodest display would occur, he would have asked Oiler to leave. That he did not do so indicates that in his judgment, no such display occurred. The examination of plaintiff's knee has not been shown to have revealed any part of plaintiff's leg that Oiler had not already seen many times while the two of them were playing softball, nor do the circumstances attendant to his viewing plaintiff's legs during the doctor's examination create a hostile work environment.

 Although "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact," *O'Shea,* 185 F.3d at 1098 (quotations omitted), summary judgment is clearly warranted here. The court's conclusion would be no different on this issue even if all of the acts which Oiler allegedly committed prior to April 5, 1998 were considered as timely. Oiler's comments about plaintiff's tan or muscular legs and her having "no butt" cannot be isolated from the context in which those statements were made. *See Gross v. Burggraf Construction Co.,* 53 F.3d 1531, 1538 (10th Cir.1995) (rough and tumble surroundings of the construction industry can make vulgarity and sexual epithets common and reasonable conduct). Those comments were allegedly made between friends while plaintiff and Oiler were playing softball, and no evidence has shown that plaintiff made any objection to them at the time, either to Oiler or to anyone else.

At work, Oiler is alleged to have made one comment about plaintiff appearing to be wearing a bustier when plaintiff was wearing a back brace, and to have kicked plaintiff in the break room, then told her she deserved it. Plaintiff admits that she considered these acts and statements to be jokes or horseplay. Plaintiff does not allege that she complained to Oiler or anyone else about his acts or statements, other than to give him what she believed to be a "dirty look" after he kicked her. Although these statements or acts may have been inappropriate, they are insufficient to unreasonably interfere with plaintiff's work performance or "create an intimidating, hostile, or offensive working environment." *Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 782 (10th Cir. 1995) (quotation omitted). Although a single sexual battery may be sufficiently severe in certain circumstances, the kick on the rear of which plaintiff complains does not fall within this category of offense. Because Oiler's acts and statements were neither severe nor pervasive, plaintiff cannot make a prima facie case of sexual harassment.

**Disparate Treatment**

 Plaintiff next alleges that her termination was based upon her gender, alleging that males who accumulated 25 attendance points were not terminated. Plaintiff may make a prima facie case of discriminatory termination by establishing: (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge. *See Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1229 (10th Cir.2000). Defendant does not challenge any of these elements.

A defendant can rebut the presumption created by the prima facie case by asserting a "legitimate, nondiscriminatory reason for the employee's [treatment]." *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir.1994). "[T]he defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir.1992) (citations omitted). The defendant's reason for discharge, however, "must be reasonably specific and clear." *Id.*

Defendant has met its burden to articulate a legitimate, nondiscriminatory reason for terminating plaintiff by showing that she received 25 or more attendance points and that pursuant to defendant's neutral attendance policy, termination was therefore mandatory.

Once the employer produces a legitimate nondiscriminatory reason for the adverse employment actions, then the presumption of discrimination created by the prima facie case " 'simply drops out of the picture.' " *Ingels*, 42 F.3d at 621 (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). It thus becomes "the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—*i.e.* unworthy of belief.' " *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 327 (10th Cir.1996) (quoting Randle v. City of Aurora, 69 F.3d at 451), cert. denied, 518 U.S. 1019, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996).

"While '[t]his burden is not onerous ... it is also not empty or perfunctory.' " *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1080 (10th Cir.1999) (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323–24

(10th Cir.1997) (internal citations omitted)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.... " *Morgan*, 108 F.3d at 1323 (internal quotations omitted). Evidence of pretext includes, but is not limited to, the following: "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria." *Simms v. Oklahoma ex rel. Dept. of Mental Health*, 165 F.3d 1321, 1328 (10th Cir.1999). Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment. *Morgan*, 108 F.3d at 1323.

"If no facts relating to the pretextuality of the defendant's action remain in dispute, summary judgment is appropriate." *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 798 (10th Cir. 1993), overruled in part on other grounds, *Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir.1995). Plaintiff's burden is to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Here, plaintiff makes several allegations in an attempt to show pretext: 1) males who reached 25 attendance points were not terminated; 2) plaintiff's 10 point infraction for the 23rd was unjustly assessed because her boyfriend notified Oiler on the 22nd that she would miss work the 22nd and 23rd; and 3) defendant failed to follow its own policy in not considering her two

days' absence on the 22nd and 23rd to be "one absence occurrence" instead of two.

■ The record fails to support plaintiff's assertion that males who reached 25 attendance points were not terminated, with the exception of Belisle. As to this employee, defendant has offered a reasonable explanation. Although Belisle did accumulate 25 attendance points, this was because he had clocked out during time he actually worked, apparently due to a mental disorder, giving him more attendance points than he deserved. His unwarranted points were removed once it was learned that he had actually been present and working during the hours for which he had been counted absent, taking him under the 25 point limit. This unchallenged explanation is sufficient to distinguish Belisle from the plaintiff. The fact that Belisle was not terminated because he reached 25 attendance points in error is insufficient to raise a material question of fact regarding pretext for gender discrimination.

■ As to plaintiff's assertion that her boyfriend notified Oiler on the 22nd that she would miss two days of work, not just one, a material question of fact is presented. Defendant denies that Mayberry requested or that Oiler approved plaintiff's absence for more than one day. But even assuming that plaintiff's version of the facts is correct, no evidence of pretext has been shown. At most, plaintiff shows that Oiler made a mistake.

■ "The pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual." *Hardy v. S.F. Phosphates L.C.,* 185 F.3d 1076, 1080 (10th Cir.1999). Plaintiff has not asserted, let alone shown any evidence, that Oiler did not genuinely believe that she did not call in her absence for the 23rd. No evidence linking Oiler's mistake, if any, to plaintiff's gender, has been raised.

Lastly, plaintiff claims that her two days' absence should have been counted as one absence instead of two, pursuant to defendant's policy, and that this procedural irregularity evidences pretext. Defendant's policy provides that "missing two consecutive days due to a documentable illness would be considered one absence occurrence." Plaintiff's knee injury was arguably "documentable" as she had seen the company's doctor less than 24 hours before she called in her absence for the 22nd, and presumably could see him again to receive documentation regarding her weekend absence.

Defendant relies upon other language from the same policy, however, in asserting that plaintiff's weekend absences should be counted as two: "If no documentation is presented you will be charged points on the basis of a single day absence." Plaintiff presented no documentation regarding her absence on the 22nd or 23rd before she was terminated upon reporting to work on the 24th, so according to defendant, was properly charged points for two single day absences.

Thus although plaintiff had a "documentable" injury, she presented no "documentation" thereof specific to her absence on the 22nd or 23rd. By requiring that an absence be only "documentable" in one sentence, but requiring that it be actually documented in the next sentence, defendant's policy creates confusion and ambiguity. Here, plaintiff's consecutive two days' absence could reasonably be deemed to be either a single absence or two absences, under defendant's own policy. If plaintiff's weekend absence is counted as a single occurrence, she would not have accumulated an additional 10 points for her absence on the 23rd, which put her over the maximum points permitted under defendant's attendance policy.

Although the court finds defendant's policy to be no model of clarity, it does not find that policy, or its application in this case, to be a "disturbing procedural irregularity" which would raise a material question of fact regarding pretext. No evidence has shown that defendant applied this policy any differently to plaintiff than it did to male employees, or otherwise manipulated its interpretation of the single occurrence language to achieve plaintiff's termination based upon her gender. Summary judgment on this claim is therefore appropriate.

**Title VII Retaliation**

 Title VII prohibits an employer from discharging an employee who opposes any acts of discrimination prohibited by the statute. 42 U.S.C. § 2000e–3(a). A prima facie case of retaliation under these statutes is made by showing "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action." *Morgan,* 108 F.3d at 1324. Upon such a showing, the burden shifts to the defendant to produce a legitimate, nonretaliatory reason for its employment decision. *See Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997). The burden then shifts back to the plaintiff to demonstrate that the proffered reason was not the true reason for the employer's decision, but instead, that the decision was made for retaliatory reasons. This burden may be met either by direct evidence of the employer's retaliatory motive or by evidence that the proffered reason is pretextual. *See id.* at 1396.

 Defendant contends that plaintiff's threat to file a grievance against Oiler does not constitute protected conduct. Informal complaints to superiors or the use of the employer's internal grievance procedures may constitute protected activity un-

der Title VII. *Pastran v. K–Mart Corp.,* 210 F.3d 1201, 1205 (10th Cir.2000); *Robbins v. Jefferson County School Dist. R–1,* 186 F.3d 1253, 1258 (10th Cir.1999). Here, however, plaintiff did not complain to her supervisors or the individuals designated by the company to receive complaints of sexual harassment or discrimination, *i.e.,* the alleged harassers supervisor, the Division Human Resources Manager/EEO Representative or the Employee Relations Department. Plaintiff admits she was aware of this policy.

Instead, the sole person she complained to was the union president, who is not among those listed to receive complaints of sexual harassment. Although notice to a union representative can be deemed notice to the employer where the employer has formally designated the union steward as a person to receive complaints of sexual harassment, *see Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 785 (10th Cir.1995), there is no evidence that Cargill has so acted here. Plaintiff has not shown the court that the union president is authorized by the agreement between the union and the company or otherwise to receive, investigate, or handle complaints of discrimination.

 Nor is it clear that plaintiff complained of sexual harassment at the time. A plaintiff "cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Zimmerman v. Cook County Sheriff's Dept.,* 96 F.3d 1017, 1019 (7th Cir.1996) (affirming summary judgment where "the implication [of the employee's complaint to the employer] was that it was a personality conflict with someone else, an unnamed someone else, and a personality conflict [which] is not a form of sexual harassment").

The court has reviewed the record to see the content of plaintiff's complaints to the union president. Llamas, the union president, has no recall of this conversation with plaintiff regarding Oiler. Plaintiff testified only that she went to Llamas to file a grievance against Oiler "for sexual harassment and embarrassment," and Llamas told her that they would do it on the 24th because Oiler should not have been in the examination room with plaintiff while they were raising her legs. (Dk. 44 Exh. A, p. 105). No other testimony appears in the record.

The fact that plaintiff chose to complain to the union president instead of to the individuals she knew were designated to receive sexual harassment complaints shows the court that at the time of her complaints, plaintiff did not perceive Oiler's acts to be sexually harassing. Plaintiff did not complain that she was exposed to disadvantageous terms or conditions of employment to which men were not exposed, nor were her statements otherwise sufficient to cause a reasonable employer to think it probable that Oiler's act or remaining in the examination room was motivated by plaintiff's gender.

Although the court has serious doubts whether plaintiff has met other elements necessary to withstand summary judgment on this claim, it will not address them herein. Because plaintiff has failed to raise a material question of fact that she engaged in protected conduct, her Title VII retaliation claim cannot withstand summary judgment.

**Kansas Workers Compensation**

Having granted summary judgment on all claims over which this court has original jurisdiction, the court declines to exercise supplemental jurisdiction on the plaintiff's state law claims against the defendant. 28 U.S.C. S 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well."). When the federal claims have dropped from the case, the seminal teaching of *Gibbs* is that the most common response is to dismiss the state law claims without prejudice. *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1237 (10th Cir.1997). The parties do not argue any unique circumstances, and the court finds none, that would justify exercising supplemental jurisdiction over plaintiff's state law claims against the defendant.

In fact, the issues raised in this claim are based upon varying interpretations of Kansas decisional law. Plaintiff asserts that Kansas law has enlarged the tort of retaliatory discharge to prohibit an employer from discharging an employee "for being absent or not calling in an anticipated absence because of a work-related injury," (Dk.49, p. 12), *citing Coleman v. Safeway Stores, Inc.*, 242 Kan. 804, Syl. ¶ 3, 752 P.2d 645 (1988), and *Pilcher v. Board of County Comm'rs of Wyandotte County*, 14 Kan.App.2d 206, 215, 787 P.2d 1204, *rev. den.*, 246 Kan. 768 (1990), among other cases. By contrast, defendant interprets Kansas law to require the traditional causal connection between plaintiff's termination and her protected conduct, consisting of "the unlawful intent on the part of the employer to terminate the employee because the employee has filed a statutory claim, or has been injured and may file such a claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1116 (10th Cir.2001). This issue, which primarily involves the interpretation of Kansas law, is well within the expertise of the state courts.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment is granted in part and denied in part, in

accordance with the terms of this memorandum.

IT IS FURTHER ORDERED that plaintiff's state law claims are dismissed without prejudice.